BERRY et al. v. KEMLINE METAL
PRODUCTS CO., Inc.

Civ. A. No. 8649.

United States District Court
E. D. Pennsylvania.

Aug. 1, 1950.

Beaman & Patch, and Townsend F. Beaman, all of Jackson, Mich., for plaintiffs.

Zachary T. Wobensmith, Philadelphia, Pa., for defendant.

KIRKPATRICK, Chief Judge.

This is an action based upon patent infringement and unfair competition.

## I

### Patent Infringement.

Three patents are involved, Berry, 1,906,-361 (claims 4 and 5), Kroenlein, 2,458,-863 (claims 1 and 3) and Hardick, 2,458,-850 (claim 1). The patents are all for toy cash registers which are much the same thing as commercial cash registers, but reduced in size, greatly simplified and inexpensively constructed.

In the case of each patent validity and infringement are in issue.

### A. Berry Patent.

This, like all cash register patents, is for a combination of a large number of elements, all of which, in one form or another, are to be found in the prior art. Roughly, the patent involves three sub-assemblies of elements, being, respectively, a key assembly, by which the keys can be depressed and automatically returned to position; a target assembly by which, when the key is depressed a target bearing a figure is elevated so as to show above the case, any previously elevated target being dropped at the same time; and a drawer assembly, by which the drawer flies open when a sale is registered. Claim 4 covers the target assembly and claim 5 the key assembly. The drawer assembly is disclosed but not specifically claimed. This patent expired May 2, 1950.

The defendant began to manufacture a toy cash register in the early part of 1948. In 1949 it adopted a new and entirely different kind of target assembly and it is only this modified construction (first marketed about May 1, 1949) that is charged with infringing claim 4. Both the 1948 model and the modified, 1949, model are charged with infringing claim 5.

I am of the opinion that the defendant's modified construction infringes claim 4 and that neither its original nor modified constructions infringe claim 5.

The target mechanism described in claim 4 accomplishes its result by providing each target with a notched flange having an outwardly inclined face so that the part below the notch extends farther forward than the part above. There is a keeper or latch of sheet metal bearing against the flanges of the whole row of targets and urged into engagement with them by a leaf spring behind it which, when the target is elevated, falls into the notch and holds the target up. When a second target is elevated it goes up high enough for the lower part of the flange, operating as a cam, to push the keeper out of the notch in the first (elevated) target and allows it to drop, the second target than falling back into engagement with the keeper and being held up by it. It will be seen that the essential part of the operation is the pushing of a keeper out of engagement with an elevated target by means of a cam on a new target being elevated.

I think that the defendant's target assembly is the equivalent of that of the Berry patent.

"The accepted rubric is that to be an 'equivalent' the infringement must attain 'substantially the same result in substantially the same way'", Royal Typewriter Co. v. Remington Rand, Inc., 2 Cir., 168 F.2d 691, 692. The defendant's assembly unquestionably accomplishes the same result as the Berry patent and, having in mind the basic idea of the Berry operation, it accomplishes it in the same way, although the details of the parts involved

are not the same. The keeper in the defendant's modified structure is a horizontal comb held down by a spring, the teeth of the comb projecting into slots in the targets. Each target has two such slots, one below the other. Below the slots is a cup-shaped protrusion on the target. This protrusion is in every sense of the word a cam. In practical operation it pushes the keeper up and away from the target so that the tooth goes out of engagement with the slot. I say in practical operation because of some remarks of mine in the course of the trial to which both sides have referred in their argument. It is true that it is sometimes possible by being very careful to release an elevated target by pushing the second target just high enough for its comb tooth to fall into the second slot in which case the cam will play no part in the operation. Obviously, however, this is not what occurs when the keys are pressed down by anyone using the machine as it would ordinarily be used ringing up a sale. What will happen every time in ordinary operation is that the second target will go up high enough for the cam to push the keeper out of engagement. It is definitely not correct, therefore, to say that the device would work just as well without the protruding parts or cams. The defendant's original construction had no cam but had a separate mechanism to rock the keeper out of position.

Claim 5, as written, is clearly not infringed by the defendant's structures. It has to do with the key assembly and requires that the supporting fulcrum, through an opening in which the keys extend, shall have spaced vertical slots *above* to hold the keys in position. The defendant never put out a device with the guiding slots in the upper edge of the opening through which the keys extend. The defendant contends that such construction would be inoperative—a point upon which I am not convinced. However, it is not important because the plaintiffs' whole effort in connection with this claim is directed to having the Court interpret the claim so broadly that it will cover a fulcrum with the key-retaining slots below, or on the lower side of the opening. This cannot be done.

It is not a question of an infinitesimal difference between above and below in the location of a point, as in the Kroenlein patent to be discussed later. To read the claim as the plaintiffs contend it should be read would turn the whole key fulcrum upside down. The plaintiffs' contention is that the adoption of the word "above" in the claim was merely an error or oversight on the part of the attorney who prosecuted the patent application. If this be true, it is also true that the plaintiffs discovered the error at the time the complaint in this case was filed which was June 30, 1948. Whether a reissue could have been obtained upon prompt application at that time is, of course, a matter of speculation but there is no doubt about the fact that no application was made then or has been made at any time since.

On the issue of validity I think that the Berry construction shows an inventive advance over the prior art—not in any striking degree perhaps but sufficient to sustain it as patentable. The many patents relating to commercial cash registers are all relevant as prior art, but it must be borne in mind that what Berry was working on was a toy. The object was to design something not too complicated that would be interesting to children, would appeal to parents and which would sell. It had to work reasonably well but primarily it had to be simple, durable and inexpensive. He was not particularly interested in the precision and efficiency which are absolutely necessary in the commercial type and not at all in expensive adjuncts which are often desired. The over-all problem was so different that the fact that the various elements of the patent all appear in one form or another in the commercial machines is not too strong an argument against the invention involved in adapting, simplifying and putting them together to make a child's toy.

The only prior art patent cited in which the cash register was a toy is Jacobs, 964,-026. It, too, is a comparatively simple device but a glance at the specifications and drawings shows that beyond that fact it has very little in common with Berry and, in particular, that it has nothing re-

motely resembling the Berry target assembly.

As further evidence of invention, the plaintiffs properly point to the phenomenal sale which the Berry device had once it was put upon the market by a competent sales organization. Since 1945 over 1,-200,000 units have been produced and sold by the plaintiff, Western. Add to this the 650,000 of a type which closely resembled Berry's, sold by the defendant, and consider the unsatisfactory experience of others in the field and I think that the record shows an outstanding commercial success.

I, therefore, am of the opinion that the Berry patent is valid.

### B. Kroenlein and Hardick Patents.

These patents were applied for in 1947 and issued January 11, 1949. They represented minor improvements upon Berry's machine which the plaintiff had incorporated into the machine it was making and selling. They were obviously taken out by the plaintiff to meet the defendant's competition and for the purpose of excluding it from the market and extending Berry's monopoly. This does not necessarily condemn them and their validity must also be determined by the same principles that govern in all cases.

The improvement on which the Kroenlein patent was granted was in the key subassembly. It consisted of substituting a combination of a spring and flap plate for the tension comb spring of Berry. The two elements accomplish the same result, namely, tensioning the keys and holding them in position, in cooperation with the slots on the fulcrum, and they accomplish it in the same way. The advantage of the Kroenlein flap plate was that it was a construction which could be assembled more easily and, therefore, more cheaply than Berry's.

On the whole I am of the opinion that Kroenlein does not show an inventive advance over Berry when taken in connection with the Webster patent, 393,089, of the prior art. I recognize that the patent issued over these two references and that the presumption of validity is therefore something which must be given more than ordinary weight but it seems to me that lifting a simple and very well-known device out of the prior art and substituting it for an element of this kind does not measure up to the standard of invention.

Both in the Patent Office and here the plaintiff attempted to draw a distinction between Kroenlein and Webster on the ground that in Kroenlein the flap plate performs two functions, namely, tensioning the keys and holding them in position, whereas in Webster it does not have the latter function. This, however, is merely because the Webster key assembly was not such as to require it, because in Webster the keys were journaled on the fulcrum and did not need an additional element to keep them in place. However, Webster's flap plate was capable of performing that function and, without change or modification, could have performed it if the keys had been loosely mounted on the fulcrum as they are in Berry. It required no invention to grasp the fact that it would do so. I do not mean to say that the flap plate is the full equivalent of the leaf spring but that the substitution of it was not an inventive step.

Substantially the same thing may be said about the Hardick patent. Its advance over the prior art has to do with the drawer assembly. It also claims the flap plate of Kroenlein. The device taken as a whole may disclose some improvement over Berry but it is so very slight that I do not think that patentable novelty can be claimed.

I, therefore, hold both the Kroenlein and the Hardick patents to be invalid for want of patentable novelty.

The question of infringement of these two patents, although not strictly necessary in view of the holding of invalidity, should be disposed of, for the record on appeal.

I think that both patents are infringed by the defendant's modified construction, which is the only one manufactured by the defendant after the patents issued.

Substantially the only point at which the defendant contends that infringement of these two patents is avoided is that in its modified construction the hinge of the flap plate is not located above the axis of the keys. The Kroenlein claims in suit call for the hingeable mounting of the flap plate "above and in proximity to the fulcrum mounting of the several key levers." The Hardick claim in suit says, "said flap plate having its hinge mounting at one of the edges above and in proximity to the fulcrum mounting of the several key levers." To avoid infringement and, possibly, better to hold the keys in position (although I do not see just how it does this) the defendant put the hinge of its flap plate five-thousandths of an inch below the fulcrum mounting of the keys and now rests its claim of noninfringement on this five-thousandths of an inch difference, admitting that it would infringe if the hinge were the smallest fraction of an inch above.

It is hardly necessary to resort to the doctrine of equivalents to find infringement. The maxim de minimis might also well apply. Provided the hinge of the flap plate is in close enough proximity to the key levers near their fulcrum, the whole matter of its precise location, up or down, has not the slightest effect upon the way in which it performs its function of tensioning and holding the keys in place. It might be quite otherwise if this were a precision instrument but it is a child's toy and it seems to me that in spite of a departure invisible to the naked eye the infringement is clear.

## II

### Unfair Competition.

The plaintiff, Western, is a manufacturing corporation with its plant at Jackson, Michigan. Prior to 1945 its business had consisted of making parts for other manufacturers and it had never made a finished article of any kind for sale to the public. Kamkap, Inc., was an incorporated sales organization having its place of business in New York.

In the latter part of 1945 Western and Kamkap (the latter originally acting in conjunction with a corporation called Cinderella Mfg. Co.) made arrangements for the manufacture and marketing of toy cash registers. Western acquired the Berry patent, which the inventor had been trying unsuccessfully to exploit for 14 years, and Cinderella, backed by Kamkap, advertised and marketed some 100,000 units during the years 1945 and 1946.

At the end of 1946 Cinderella dropped out and Kamkap continued to market the item. It contracted to buy from Western 475,000 units to be shipped in monthly installments during the year 1947 and Western agreed to ship direct to Kamkap's (the "purchaser's") customers and not to sell the toy or any other toy to anyone other than Kamkap.

During 1947 Kamkap sold, principally to jobbers, chain stores and mail order houses, 335,000 units—a volume of business apparently highly satisfactory and profitable to Western.

At the end of 1946 Western, having come to the conclusion that it would be more profitable to get rid of Kamkap and sell directly, refused to renew the contract for the following year, as it had the right to do, and thereafter sold through another agency.

Faced with the loss of its source of supply and the profitable market which had been built entirely through its efforts, Kamkap promptly made arrangements with the defendant Kemline, a manufacturing corporation controlled by it, to make toy cash registers for it and, by May, 1948, was selling in competition with Western. It is this competition which Western seeks in this action to restrain as unfair.

Western bases its case chiefly upon what it alleges is a confusing similarity in the appearance of the two toys, charging that the defendant deliberately copied the plaintiffs' for the purpose of appropriating its goodwill. The trouble with this contention is that there is no evidence of any association in the mind of the public between the dress and appearance of the goods and Western as the manufacturer. During 1945 and 1946 the toys were sold under the trade name "Tom Thumb" and a trade-mark in the form of a decalcomania

on the base of the cash registers was used which prominently displayed that name and also "Cinderella Mfg. Co., Jackson, Michigan." During 1947 the same decalcomania was used except that "Kamkap Inc." appeared instead of "Cinderella" and also the words, "Factory, Western Stamping Co., Jackson, Michigan." On some, but not all, the metal base was stamped with Western's name but very faintly so as to be hardly distinguishable without the aid of a glass. During 1947 Kamkap had a post office address at Jackson, Michigan. There is no evidence that Western ever spent any money in advertising the toy, in connection with its own name or otherwise.

Since the end of 1947 Kamkap has not used the Tom Thumb trade-mark or trade name or anything like it. Western has continued to use the trade name and, I believe, the trade-mark without the name of Kamkap. I am satisfied that at no time did Kamkap intend its buying public to believe that its machine was manufactured by Western. The most extreme inference which can be drawn from the plaintiffs' evidence, if it is all accepted as true, is that Kamkap made no effort after the termination of its contract with Western to advise buyers that the cash registers which it was selling were now being made by a different manufacturer.

Kamkap did display some Western cash registers at the New York toy show in 1948, after the relation between the parties had been broken, but it still had on hand a large number of Western's machines, which it had the right to sell, and there is no evidence that it used these samples to take orders for the machine manufactured by Kemline.

■ In an action to restrain unfair competition based almost entirely on an alleged similarity in the appearance of goods the plaintiff must show that the appearance of the goods has acquired a clearly secondary meaning and come to mean his goods. 63 C.J., page 455. There must be some appropriation of or injury to the plaintiff's intangible property in his good

will and business reputation—at least in the absence of evidence of flagrantly fraudulent intent. As a matter of fact, Western's real grievance is that Kamkap is competing with it and causing it to lose sales in a field in which competition is free. It would not be of the least help to Western for the Court to require Kamkap to mark its goods "Not manufactured by Western Stamping Co." and yet that is about as far as the Court could go in a case like this. With the exception of the order in which the numerals appear on the keys, whatever copying has been done is in functional and structural features. The color red is particularly adapted to children's toys and is certainly open to use by all.

The conclusion is that the cause of action for unfair competition cannot be sustained.

An order for judgment in accordance with the foregoing may be submitted.